Good morning. May it please the court. My name is Henry Brandenstein. I'm with Venable in the Tysons Corner, Virginia office. I'm here today on behalf of the appellant, Montana Homes. I would like to try to reserve two minutes for rebuttal if I might, Your Honor. And there is a hum. There are two issues that I'd like to try to address during the time that I have today. One is whether or not the district court erred when it determined that the settlement agreement that it found the parties had entered into was a divisible agreement. The other is just briefly whether the Montana Supreme Court decision in Hetherington in some way trumps the statute of of 2004 these parties entered into a settlement agreement and that the component parts of that settlement agreement were divisible. We believe that any argument that this case, that this settlement was divisible requires the justice of Solomon and requires someone to split the baby. We believe that that's what the district court did in this case, or at least that's what the district court tried to do. Well, that you had a certain amount that had been allocated for environmental damages and you had a certain amount that was allocated for the property, and that was pretty clearly set out. Well, no. Actually, Your Honor, in the July 2004 letter from former counsel for Montana Homes, the deal was set out, and it is the letter that Burlington Northern relies upon when they say that there was a settlement agreement. The July 2004 letter says Montana Homes will convey the property in return for $512,000, and in connection with that if you look at the draft settlement agreement that Burlington Northern relies upon in this case, Your Honor, and in particular focus on paragraph one of that settlement agreement, you will see that in fact there is a consolidated statement of what the consideration is for this transaction. It says in consideration for the conveyance of the property, in consideration for the release, and in consideration of the covenant not to sue, all these things are part of the consideration, and then it says within 14 days of the full execution of this agreement, Burlington Northern will pay $152,000. Well, what about that both parties notified the court that the matter had been settled, and when, you know, I was a trial judge, and I remember when both of the parties said this matter is settled, and you take it off calendar, then you figured that the matter is settled. So my question is, aside from wanting more money, what did Montana Homes require to settle the case? Well, Your Honor, what Montana Homes required to settle the case was to be treated fairly by Burlington Northern in the context of the other cases that Burlington Northern was settling in the area. After Montana Homes discovered that in fact it was receiving pennies on a settlement that other parties were receiving, nickels and dimes and quarters, it decided that it had been played for a patsy, and it decided... Well, I guess, but let's assume that it had been played for a patsy, but the issue really goes back to whether under Montana law, if it had been settled. I mean, you can make a bad deal. I mean, a lot of times in criminal cases, there's a saying, the first to squeal gets the deal, and then everyone else wants a, you know, they want a better deal after that. But here, you know, maybe Montana did make a bad deal in light of what everyone else did, but would that in and of itself, would that trump whether there was a settlement? I believe that the statute of frauds would trump all of that, Your Honor, because the statute of frauds in Montana makes it very clear that a conveyance of real property, an agreement to convey real property, is invalid if it is not in writing and signed by the party to be charged. Let's assume that's true. What about Clause 10, which basically makes any illegal or invalid or unenforceable provision of the settlement agreement separate and apart, that the rest of the agreement will be enforced? That's correct, Your Honor, but if you look at this Court's 1991 decision in Texaco, which is cited by both of the parties, it makes it clear that a contract will only be divisible, and the severability provision will only save the contract if, in fact, the component parts of the agreement can stand on their own. Well, they can. Well, no, it can't, Your Honor, because in this case, one of the elements of consideration that was supposed to flow to Montana Homes was they were supposed to of the risk and liability associated with a contaminated piece of property. They were also supposed to be selling this piece of property to the only real party who has any interest in buying it, which is Burlington Northern. And let's just concentrate on that. And there was a specific amount of money set forth to deal with the purchase and sale of the homes, right? $360,000. The Paragraph 1 of the settlement agreement reflects that the purchase price of the property will be $360,000. Okay. Let's just stop right there. And then with respect to the balance of Montana Homes' claims, et cetera, against Burlington Northern, that the settlement agreement provided for the payment of $152,500. No, it doesn't, Your Honor. If you look at Paragraph 1, again, it talks that $152,000 will be paid within 14 days of the full execution of the particular element of consideration, a release, and $360,000 is being paid for all of the other things that are supposed to flow to Montana Homes. If you look at Texaco, Your Honor, it says that if the contract is severable and you are going to rely upon an apportionment of the consideration to determine that it is divisible or severable, then what you have to ask is what are the elements of the consideration? What is supposed to be flowing to both parties? What is their primary purpose of entering into the negotiations? In this case, I would assert to the Court that Burlington Northern had no real desire to purchase this property whatsoever. It wanted a release. How is the consideration that was received by Burlington Northern in this case apportioned? They got everything they wanted. There is nothing left for them now. And in fact, now, they have no interest in purchasing this property, and neither will anyone else. That's now. Let's look at the time of the agreement, what each side was agreeing to give up and receive. Looking at the state of events now, that is not within the contemplation of the parties. What was the $152,500 for? The $152,500 was the down payment in connection with the settlement agreement. All right. So it's just a down payment on what? The purchase of the house? Well, there's no house on the property, Your Honor. It's actually a commercial property. But it was an initial payment that was going to be paid as an inducement to the execution of an agreement which would take this case outside the statute of frauds. That's what was going to happen. And if you look at the agreement, Your Honor, it also provides in Section 7 that Burlington Northern is – there's not supposed to be a stipulation of dismissal until five days after the conveyance of the property. In this case, they got their stipulation of dismissal, and they got their release. And in fact, they got, I would assert, 100 percent of the consideration that they were entitled to receive, that they bargained for. Texaco makes it very clear that you need to look at what the primary purpose of the negotiations or the agreement are if you are going to determine that it can be severed. In this case, the district court not only decided that there is a release of past claims, but in fact, there's a release of future claims. Any future claim that Montana Homes may ever have against Burlington Northern arising out of the contamination of this property has been released. As the environmental contaminant continues to migrate, we have released them under the terms of the district court ruling. Do you want to save the balance of your time for a rebuttal? If I might, Your Honor. Thank you. Good morning. Good morning. May it please the court. I am John Bergkopf. I am counsel for the defendant, Applee, the Burlington Northern Santa Fe Railroad. Your Honors, let me begin by just driving straight at some of the questions that were addressed to my colleague representing the district court. The language of this settlement agreement is exceedingly clear, and as Judge Siebel found, it does express the intent of the parties here. What about clause one uses and to connect the payment for settlement and the land sale? Why should we read the two parts of clause one as two separate clauses? Because they in fact are, Your Honor, if you look at those clauses of paragraph one, the first check is to be issued within 14 days of full execution of the agreement. And as Your Honor may recall, the record reflects that that was to take place in November as the final drafts had been already exchanged. And then the second payment, the closing of the transfer of the real property. So they're entirely separate. Entirely separate. To try to conflate them is just not to read the English of this agreement. And in fact, that's precisely what they're attempting to do with the whole severability issue in paragraph 10. It couldn't be more clear. It is a severability clause, as Judge Wright has pointed out. It's severability clause. And what other aspect of this short agreement would be unenforceable? This is not a lengthy agreement. Now, you can come up with some hypotheticals, but the fact Let me ask you this, though. There is a severability clause. All right. And we've discussed that. Aside from the severability clause, what other language in the settlement agreement shows an intent for the agreement to be severable? Just what we discussed. Paragraph one, Your Honor. And in terms of the payments. And the apportionment of consideration is crucial. The court, this court, in the 1991 decision in Texaco, which the other side completely misreads, makes it clear that the initial scenario, and that's the phrase the court uses. The initial scenario under which a settlement agreement of this sort is deemed to be severable is when consideration is apportioned. The second aspect, which they argue at length in their brief, but with absolutely no evidence in record, relates to the question of how and whether something is auxiliary or unimportant. But that's a second unrelated test. The court makes it very clear they're totally unrelated. And it says flat out, if consideration is apportioned, that tells us it's severable. And not only do we have apportioned consideration here, but we also have a severability clause within this agreement. And it's not a question of the Hetherington decision in Montana trumping anything. The Hetherington decision is so directly on point because it is the starting point for Judge Siebel's position here and Judge Siebel's decision that there was an agreement, the agreement was binding. And now the second question I, Judge Siebel, have to determine is what are the terms of that agreement? This is often a tough question, often may involve the wisdom of Solomon. But here we had an exchange of drafts, a rewrite, correspondence that indeed went to the individual client. In this instance, both the July 22 letter and the July 29 letter were copied. Well, let me ask you this. What terms were not settled by the November 2, 2004, when Mr. Pettit sent the email forwarding the final settlement for counterpart signatures? None. So at your position there was none? None. Absolutely none. The agreement was done. The correspondence, as your Honor will recall from the record here, says, we're sending you this. We know you'll execute it. We'll execute it and counter signatures at the same time. This is November 2. It was a done deal. It was a done deal. And the judge, Judge Siebel, I suspect was as stunned as we were to learn that no, despite the representations to the court on two occasions, and these were not, as your Honor knows, representations merely from defendant. These were from both parties. We contacted the court, we contacted the clerk, and flat out represented this is a done deal. Was there any question of, well, we've got some open issues, your Honor, but we think we're making progress? No. That was not was communicated here, nor was it communicated between the parties to this litigation. It was not until December 9, when we received a letter from counsel for the plan, that we were aware that this was going anywhere but doing exactly what counsel had said they would do in November, the prior month, countersign this agreement and send it on, and the deal was finished. Then, of course, Judge Siebel had to face the question under contract law of enforcement for this agreement, how do I deal with that? First of all, of course, he clearly decided there was an agreement, and under Hetherington, that's as clear as can be. And the plaintiff has attempted here to kind of slide out from and under that by saying, well, we didn't intend to re-put this to bed until we had signed off on the document. No. Hetherington makes that crystal clear. That is not the law in Montana. In fact, it's not the law in any state, as far as I am aware, that you can hold back a latent condition and not say it to the other side and somehow that will make this non-enforceable. Not the case. And then secondly, what are the terms? And in this case, we've got the terms within the four corners of the agreement, of the written agreement, and before Judge Siebel were affidavits of the various parties and one even from the various counsel involved here. And he had the conduct of the parties before him. And to overturn his decision here as an abuse of discretion based upon the record here, based upon the actual document that is before the court, and the clear severability of this agreement as evidenced by the parties themselves, is crucial. This is not a judicially created contract. The plaintiff is not left holding any bag which the plaintiff agreed to hold. What did BNSF intend to do with the Montana homes land? I don't know the answer to that question, Your Honor. It is land which adjoins the rail yard, and I honestly do not know, and there's nothing in the record to indicate, and I don't mean to duck it. I just simply don't know the answer to that question. All right. Well, if it's not in But that's what we always tell people. But the fact, I tried to say that, Your Honor. Well, it's true. We say that to people. So basically if I were to summarize your position is it was all settled, everyone understood what it was, but Montana homes decided they could get more money, and that's what's going on here. And they used, yes, and they used the statute of that argument here just goes so far. And Judge Schiebel held it can go to the land and the transfer of the land, but when you have, as we have here, these crucial, the crucial presence of a severability clause and an apportioned, specifically apportioned consideration, and a lot of money. Well, how do we know from the record that, what was it, the 152 or whatever, how do we know that was for contamination? We know it was for a release of the claims, and those claims were for contamination, for trespass, for nuisance, and that's how we know it. We know it the same way, Your Honor, any civil case is settled and what the money is settling. Well, the plaintiff or the appellant seems to say, well, it was also for future, and how could we have released for future when we didn't know what those were? Future only in this sense, that the contamination which was presently known, and if they make an argument that somehow this has, this same contamination is now continuing, but they were aware of it and it is known, that would, that was released. Future conduct, the putting, the absurd hypothesis, for example, of putting a hose in their property with impunity, no, that clearly wouldn't be covered. That wouldn't be covered in any state in the union. All right, your time has expired. Thank you for your argument. I'll go ahead. We have a deal struck in July, a draft agreement follows in August, and then a couple of months later in November, we've got the final settlement agreement being tendered by counsel for Montana Homes. What was taking so long, given the fact that this was really a simple agreement? What was going on? Well, I think it's fair to say, at least as far as the record is concerned, your honor, two things. It shows that there were exchanges of drafts. The record shows that. And so it took until that period of November, up until November 2, to get the exchangeable, countersignable draft. Then the record shows that the principal here, Mr. Bain, apparently, and this is in the record, showed up in Livingston to sign it and to finally sign the document and talked to some neighbors and said, I made a bad deal here. All right. Were you involved in this? No. Well, yes. Well, your honor, yes and no, I was not directly, one of my partners was directly involved. The amount of money, that was clear, right? Yes. And the fact that Burlington Northern was going to buy the property, that was always clear from the beginning, right? That was going to be, yes. It never changed? That didn't change from our perspective, no. So the central terms of the deal were established back in July and they never changed, right? That's correct. That's correct, your honor. And the rejection... I don't understand why it took so many months. Well, it was just simply, I guess, a concession to other things going on in life. We did not get it papered and in retrospect, I wish we'd papered it in two days, but we didn't get it done, but it's not that attenuated. And I think what happened as well, your honor, is I know this as a trial lawyer, any time you have kind of the release of the trial date deadline, it can slow you down sometimes in terms of follow-up. And it was simple. There's no nefarious undercurrent here. It was a pretty straightforward situation in that respect. All right. Thank you, Ms. Perdo. Thank you. Thank you, your honor. A follow-up on something that Judge Wright was mentioning. With regard to the essence of the agreement, the essence of the agreement was that the property was always going to be conveyed. As far as your questions with regard to future issues, your honor, we don't have any risk for future liability associated with this property if the essence of the agreement is honored and in fact, title is conveyed. Because once title is conveyed to Burlington Northern, we don't care if they continue to environmentally contaminate property that they own. What the district court has done is left us in a position where we have something that the essence of the agreement was supposed to take out of our responsibility and transfer to Burlington Northern and make it their responsibility. Hetherington, your honor, stands for the unremarkable proposition that if you don't intend to be bound by your oral agreements, you need to tell the other side. You can't have a latent intent not to be bound. Well, so your bargaining chip is that, I mean, you could convey it right now for the 360 or whatever, but you want to get more money and so that you're holding out. So what you're saying on the one hand, you know, our bargaining chip to get more money is to hold it, but then it's unfair that if we hold it, then we can still be responsible for the contamination. Your honor, the only buyer for any of these properties is Burlington Northern. If we are going to establish what the comparable sales are, we need to look to what Burlington Northern is paying our neighbors for property that is smaller and they're paying them substantially more. That's just sales. You get a deal and then you look back at the deal and you go, my God, I wish we had done a better deal. But isn't that the way it is in every transaction? Someone is going to pay more than they really wanted to pay. Someone's going to receive less than they really wanted to receive. But what the heck, let's do the deal. But your client just decided, no, this is, I don't want to go through with it. Despite the fact that there have been written confirmation of the deal. Your honor, all that written confirmation was by an agent of the principal and the statute of frauds in Montana makes it very clear that in the absence of a signature from the principal, the contract is invalid. All right. And whether it's because we want more money or because we've simply changed our mind, we would assert that we never changed our mind. We would assert that it was always our intention that the principal needed to sign a document to be bound. All right. And then let's go back to your earlier argument that that particular aspect, the purchase or sale of the property is not severable from the entire settlement. That's your position, right? It's our position that in the result that we've got from the district court, there is certainly no severability of the consideration received by Burlington Northern. They've received 100% of what they bargained for, a release and a termination of the litigation. Actually, Burlington Northern got way more than they thought they were going to get. But whose fault is that? Your honor, if we rely upon the statute of frauds, which we're entitled to do, it's no one's fault. It's the law. The law says that when you're going to deal with real property, you need a signature. You need a signature. I can't sell you my house without a signature. You're trying to sell the property to Burlington Northern without providing written authorization of your attorney's authority to enter into this deal. You did. I mean, that's what Montana Homes attempted to do. And now they want to back out going, ah, you know, our lawyer didn't have the authority to make this deal. Your honor, the cases from Montana dealing with judicial estoppel make it clear that you can be judicially estoppel from asserting the statute of frauds if, in fact, you admit the agreement. In this case, the affidavits and the declarations that were submitted by the attorneys and the client all indicated that it was always their understanding that a document needed to be prepared. If you look at what the district court was told when the district court was asked to extend the time for the stipulation of dismissal, they were told that the parties need more time to formalize their agreement. I would assert to you that Burlington Northern always anticipated that this deal needed to be settled in writing. That's why they said they weren't going to pay $156,000 until the agreement had been fully executed. And is that why both sides told the court that it was settled and we don't need a court date? Your honor, I believe that the attorneys jumped the gun. They made a mistake. But both attorneys participated in that mistake. And there is one side here that's trying to take advantage of it. And one side here that has been prejudiced by it. Is Mr. Berghoff incorrect and mistaken when he says that the essential terms of the deal were pretty much decided back in July? The court decided that the essential terms of the deal were decided in July. I would assert that there is no basis in the record for deciding that that essential deal included a severability provision. Well, no, that's maybe I didn't make myself clear. But was it always decided that for X number of dollars, the claims for nuisance and trespass and the contamination, all of that was going to be resolved. And for another sum of money, there was going to be a transfer of ownership of the contaminated property to Burlington Northern. Was that that that that was decided back in July? No, sir. If you look at Mr. Pettit's letter of July 2004, it references a united a unified amount of money, $512,000 in return for the conveyance of the property to Burlington Northern and the release. That is the when you inform the court that the matter was settled. Were there any other numbers out there than the July numbers? No, no, there's nothing in the record to indicate that there was. I was not party to the negotiations. OK, I think we're well aware of both sides arguments. Thank you both for a good argument in this matter, and the matter will stand submitted. Thank you.
judges: Clifton, Callahan, Wright